All right our last case today is Holmes versus Elephant Insurance Company. Ms. Koff, did I pronounce that correctly? All right, thank you. We're glad to hear from you. Good morning. May it please the court, Kate Baxter Koff on behalf of plaintiffs Christopher Holmes, Trinity Bias, Jamie Cardenas, and Michael and Robert Shaw and the class that they seek to represent. As the Eleventh Circuit recently held in Green Cooper versus Brinker, the presence of information on the dark web as pleaded by two of the four plaintiffs in this litigation provides sufficient evidence of both a present injury and a substantial risk of future injury and the future misuse of personal information associated with their names and driver's license sufficient to find a concrete injury sufficient to establish Article 3 standing. In this case, because the Fourth Circuit's holdings in Hutton back and the statutory cases in TransUnion and since then counsel a reversal of the district court's decision, the plaintiffs ask that this court find that they have Article 3 standing. In this case, there are three or possibly four different lines of analysis that this court can and should pursue to analyze Article 3 standing. And that's sort of in two subsets, which is standing for damages for a common law claim and standing for injunctive relief for a common law claim and then standing for damages and injunctive relief for statutory claims. The district court here... We have to find standing for each claim separately? Yeah, the Fourth Circuit case law is pretty clear that standing is done on a claim by claim basis and that also that the standard for how it is that that requirement is met changes throughout the case and matches the requirement, the evidentiary requirements from the beginning to the end of the case, right? So this case is at a motion to dismiss. So like in Hutton, it's just a question of whether we have plausibly pleaded facts sufficient to support an Article 3 standing claim. Right, but we have to find standing for each. Yes, that's correct. It's not separate theories. It's that we have to actually find standing for each separate claim. Yes, that's correct. And that it's possible, I suppose, that this court could conclude that we have standing for some claims and not others. When other courts, especially courts of appeal, have analyzed this, it has been most common that there's a distinction between whether there's standing for a damages claim versus an injunctive relief claim. But in this case, it could also be the case that there is statutory standing for the DPPA claim under Gary, even if there's not, you know, common law standing under the traditional analysis for the common law claims. So why don't you tell us what you're pleading say that tell us that you have a present injury or a future imminent injury? Sure. So, obviously, it's injury, in fact, traceable to the defendant's conduct, redressable by a favorable decision. Injury, in fact, I think is the largest portion of this discussion. And we have four named plaintiffs, two of them who were all subject to a data breach or a data disclosure at Elephant Insurance Company. Why don't you take Mr. Cardenas first? He's one of them that has his driver's license, he says, on the dark web. Yes. Tell us about him. Yeah. So Mr. Cardenas received notice in June of 2022 from Elephant saying that his name and his driver's license number were compromised in the attack. He got he thereafter received notice that is in that particular information, his name and his driver's license number were on the dark web. He thereafter spent time dealing with that, the fallout of that. So, making phone calls, securing his information, monitoring his credit. He continues to do that and continues to do that going forward. How does an individual's driver's license number, not the full driver's license, right? It was just the driver's license number without the other information on the driver's license. How does that put an individual at risk of identity theft? So, it was the name and the driver's license number. So, under federal law, a driver's license number in conjunction with the name is protected information because that information can be used both alone and when aggregated with other information in order to commit identity theft. And we say that's true in a number of circumstances. First, that the presence of the information on the dark web by itself constitutes identity theft. It has been taken by a third party hacker. It is posted for sale on an encrypted criminal forum and is available for that. So, this is, in your view, a present injury? Yes. Yes. Yes. The presence of the information on the dark web in and of itself is a present injury and a present experience of identity theft. Let's take a slightly different factual setting. So, instead of using computer access, let's say that the applicant and the insurance agent are going to go old school. So, he goes and he fills out everything on a written form. The agent has it. He's going to process it. The agent goes home for the night. Somebody breaks into the insurance agency and they steal that off the agent's desk. So, does that lead to a present injury? I think it would depend on the circumstances. Well, and then post it on the dark web? Sure. Okay. So, I think yes, but it would depend somewhat on the circumstances of the theft. So, take a sledgehammer and knock out the window and break in. I think the more violent the intrusion, the less likely that there can be negligence associated with the action on the part of the agent. So, the facts that I would want to know are... Why do you care whether it was negligence? Well, in our... You sort of accept that it has to be negligence? Why? In fairness, no. Our claim is more... I didn't think you wanted to do that. So, you can do them in alternatives, like if negligence is required, then we do that. But why do you think negligence is not required? So, what I was trying to speak to was when you talk about data breaches or data disclosures, when you're talking about computerized information, one of the ways that courts often analyze them is to think about the ways in which the information is being targeted by outside sources and how much that's connected to an increased likelihood of harm. We're not talking about a likelihood of harm, right? I took JJ's question to be out whether it's a present... He asked, is it a present injury? Not an imminent injury, right? The question he asked was, is it a present injury? And your response is, well, it depends on negligence. And that's what I'm trying to understand is, why do you go there? Why do you think that the negligence of the agent, right? Did he lock his door or whatever it is that you want to describe? Why do you think that matters when we're asking the question in TransUnion about what the nature of the harm is? I don't think it matters for injury, in fact. And I think that I anticipated the question of traceability instead, which is, I think that it constitutes a present injury. I think it constitutes both a present injury and an increased risk of future harm, right? So I think there is both the present injury that the information has been taken and that it, and in our scenario, if it's on the dark web, that is a present injury, a present experience of identity fraud on the part of the person whose information was compromised. And then it is also an increased risk of future harm to that person. And so I take that argument to be that there need not, in order to draw the analogy to the public disclosure of private information, there need not be any actual disclosure, right? That that element of that common law tort doesn't go to the nature of the injury at all. And so whether it's intentional, negligent, or unforeseeable, that the element of disclosure in that common law tort is not a relevant inquiry for determining the nature of the injury and therefore doesn't matter under transunion. Is that the argument you're making or am I making a different argument? Well, I think if this court concluded that element wasn't necessary, that we would be fine with that. That is not my, but that is not my experience of the case law. I think the case law says, yeah, I think this is only in the case of statutory claims, right? Because I don't think we have to have a common law analog for a negligence claim. No, no, we're talking about the statute. But for a DPPA claim, your argument is this is a, when you look at transunion, transunion tells us to make an analogy, right? The analogy that you've put forward is public disclosure, private information. That requires three things effectively, publicity, private information, and disclosure, right? Those are basically the three things. Yeah, yes. I think, yeah, you have to, yeah. The private information is the invasion piece, right? So those are the three pieces, right? I understand the first two arguments, but your colleague on the other side said because the information was stolen, or a version of your colleague's argument, and the premise, I take it, of Judge Agee's question is that there's no indication here of voluntary disclosure, which would be required under that tort, and so you don't have an analogy, right? Because it was stolen. So for, I think that's a question of the pleading of the claim, because we do make a claim that the information was voluntarily disclosed. I understand the fill box, but stay with this, that's an alternative argument, right? So stay with this argument for a minute. I get that's a different argument. Maybe I'm not making myself clear enough, and I'll let you just go on if you want to. Do you believe, in order to draw an analogy to the public disclosure of private information, that you need to show all three things, that there's publicity, that it's private information, and that the defendant disclosed it? I believe that we need to plead that the information was either intentionally or negligently disclosed. I don't believe that it has to be voluntary, because I don't think that that's part of that claim. That is an element of a DPGA claim. Or negligent, but it has to be one of the two. If they are not negligent, in the sledgehammer example, you agree that that's not an analogy to that common law tort? I didn't understand that to be argument before, but if that's all you're arguing, that's fine. I guess what I'm saying is, I think that there is an element of disclosure. I think that we have to plead all elements of the common law claim. I think the case law is very clear that there can be a very large difference in degree rather than kind. It doesn't need to have constituted a public disclosure, a private flax claim at common law. We don't have to meet the standard for the claim. But you do have to be able to make an analogy to all the parts of the claim. And in this situation, we do make an analogy to all of the parts of the claim. We say that the way that Elephant designed and configured its online system constituted a disclosure on their part. That's paragraphs 4, 5, and 153 of the complaint. And so that's sufficient. What you say those paragraphs say, makes this a disclosure on Elephant's part? Yes. So we allege that in the spring of 2021 and going forward, there was a concentrated and online and configured online attack on insurance companies and their agent and consumer platforms for insurance-based information and specifically in which hackers targeted driver's license numbers and names in order to disclose that information. And that Elephant configured its online quoting platform, either for agents or consumer facing, in such a manner that disclosed that information to third parties in a voluntary fashion. That's paragraphs 4, 5, and 153 to 155 of the complaint. So is that 4 and 5 amounts to an argument of negligence? I mean, I think our argument is that it is a statutory violation of the DPPA, but also that it is in fact negligent. You have to have knowing disclosure to cover the DPPA. So your argument, at least for the statutory part, is that this is the equivalent of an intentional disclosure, a knowing and intentional disclosure? Well, it's a voluntary disclosure. The standard for DPPA claims, and I will say like this is whether or not we prove a claim like on a 12B6 level rather than whether we have standing for that claim. But knowing disclosure does not mean that you have to, it's a general intent question, not a specific intent question. But yeah, at least two district courts have allowed claims to survive in exactly this scenario. So you started out by saying you needed to establish standing. By conceding, you need to establish standing for each separate claim. And one of your claims is for injunctive relief. So I understand you've made an argument that there have been, there's been a breach and that your clients have suffered past damage. What's the argument for risk of a future data breach? Sure. My time has expired. Do you want me to answer that question? Okay. Yes. So we have two different arguments about injunctive relief. The first is that Elephant continues to maintain the private information that it had before and has not done anything to ameliorate those systems. So it is at a heightened risk of future data breaches. And then second, that the structural configuration of the system, of the computer systems that they have, makes it so that the disclosure of that information is also, continues to be the case because they have not changed anything about the way that they configure those systems. Thank you. All right. Thank you. You have some rebuttal time. Mr. Monagle? Yes. All right. We'll hear from you. Thank you, Your Honor. Thank you, Your Honors. Good morning. And may it please the court, James Monagle of Mullen Coughlin here for Elephant Insurance Company. I'd like to begin by discussing the Ninth Circuit's recent nobler opinion, which Elephant brought to this court's attention as supplemental authority, because I think it will provide some background for some of the questions that just occurred. As the district court noted in its order here, the court need not accept as true allegations unless they have a sufficient factual basis to render them plausible. And as the Supreme Court instructs in Iqbal, in assessing plausibility, this court must draw on its judicial experience and common sense. So here the court's being asked to find it plausible that the Elephant breach was based on the exploitation of an auto-populating insurance quote tool. But this action is based on plaintiff's receipt of a data breach notification letter. And unlike other DPPA cases involving data breach notices, Elephant's notification letter makes no mention of any auto-quote tool being exploited. And in fact, nowhere in the complaint do plaintiffs allege that they visited Elephant's website or witnessed the use of any such auto-quote tool at any time, either during or after the incident. And that's noteworthy because there's no factual support for plaintiffs to seek injunctive relief based upon the alleged continuing use of such a tool. Instead, the plaintiffs argue that it's a fair inference to conclude that such a tool was used due to two alleged facts. One is a prior wave of incidents that were targeting other insurers' auto-quote tools. However, those incidents are alleged to have occurred more than a year before Elephant's incident. The plaintiffs allege at paragraphs 3 and 47 that all in 2001, there was a series of breaches that happened of this tool. And that on February 16, 2021, the NYDFS reported that it began receiving reports as early as December 2020 that this tool was being exploited. The plaintiffs allege that Elephant was on notice of this wave in 2021 and as a sophisticated insurance company, but yet Elephant's breach didn't occur until more than a year later on March 26, 2022. Therefore, the court does not have to accept plaintiffs' conjecture that there was even a tool used here that would make some kind of voluntary disclosure of plaintiffs' information. The other allegations that plaintiffs rely on to argue that this theory is plausible is that Plaintiff Holmes claims not to have had any direct contact with Elephant, but Elephant could have received this information as part of providing a quote, other than through the fraudulent use of an auto-quote tool, such as if a broker sought a quote from Elephant or if he used one of many ubiquitous online multi-quote marketplaces, such as selectquote.com. Again, in that case, Nobler, the Ninth Circuit, also found it not plausible that the plaintiffs concluded that of the different types of information here, name, driver's license, or date of birth, by the way, you had to have some of those components already, the threat actor would have, to use and manipulate the auto-populate tool impersonating one of the plaintiffs. Any of those particular components was involved is speculation. What they said was, aside from the factual allegations pulled from the notice, plaintiffs provide no additional allegations that might provide a credible basis to conclude that the plaintiff's driver's license were indeed taken. Plaintiff's conclusory allegations were also rejected in this regard. Your letter to the plaintiffs said there was a breach. So does it really matter how the breach took place that you've conceded that there was a breach? It does, Your Honor, if we're going to get into later the analogs to torts, which is what Judge Richardson was focusing on in terms of does there need to be an analog here. And I'm happy to skip ahead to that particular argument. And the answer is yes, there does need to be all of those elements. And I believe that... So help me understand why that is. So when I read, let me just take how I read TransUnion and tell me why I'm reading it wrong. TransUnion tells me to focus on the type of the harm. And then it looks at elements that affect the type of harm and like publication there. And without that publication, there is no type of harm. But when it looks at elements that address the degree of harm, right, like falsity, it's willing to relax those. And I guess the challenge I'm having is when I look at the issue of the element of disclosure for this tort, it doesn't affect the harm to the plaintiff at all. The plaintiff is in the same boat if somebody, if Judge Agee has my private information in his office and it's stolen or Judge Agee sends it out, right, the harm to me is the same either way. So whether Judge Agee intentionally, negligently, or without either of those, my information got out, the harm, which TransUnion tells me to look at, the type of harm is the same. So why don't I just disregard that altogether and not care one bit whether it was intentional or negligent or neither of the above? Well, this Court is no stranger to analyzing TransUnion in terms of these harm analogs. O'Leary v. Trusted ID, Fernandez v. RentGrow, Hensley v. City of Charlotte. These are recent cases in which these were analyzed. And the real question is how far do you stretch the standards to still fall within that close relationship? But I'm asking a more fundamental premise, right, is that why do we care about the elements that don't go to the nature of the harm at all, right? So I understand the stretch argument, and maybe that's a version of what I'm saying, but the disclosure doesn't go to the nature of the harm at all. It might go to who is responsible for the harm, right? Is it the thief or is it Judge Agee? I get that. But it doesn't affect the harm to me. The public now knows my private information. And so I am harmed in the same way no matter whether Judge Agee was blameless or did it intentionally. Well, respectfully, Your Honor, I think it does matter who perpetrates the harm because otherwise you do fall afoul of having this be traceable to traditionally recognized torts. Totally get that, and that's a traceability question. But for injury in fact, I take since you move away from it, you agree for injury in fact purposes, it doesn't matter whether he disclosed it or not. It only addresses traceability, not transunions like harm. I actually don't, Your Honor. I believe that, for example, in Bonac where they found that there could be a harm there that's sufficiently analogous, and they cited the public disclosure of private facts. I think that was because that was a breach where somebody invaded those systems and took the data, and I don't believe that there was a disclosure there at all. And that's one of the... I understand you think it's wrong, but what I'm trying to understand is transunion tells me to ask the question, what is the nature of the harm? Is the harm analogous to the harm from a common law offense? Not whether the cause of action is analogous to the common law cause of action, but whether the harm is analogous to the harm. And you're asking me to think about something other than the harm. Well, I'm not, Your Honor. I believe what you're trying to do is draw an analogy here to the public exposure of private facts. And for the court to find that to be plausibly pled, it would first have to find that elephant exposed plaintiff's information through an auto-populate tool, which again, I challenge... Nope, doesn't have to show that at all. My theory is it doesn't have to show that at all, right? And so, I mean, you can respond differently, but what I'm trying to say is, help me understand why you think that goes to the nature of the harm as opposed to who the responsible party is. And we can talk about traceability if you like, that's an alternative argument, right? But as far as the nature of the harm, it doesn't seem to change whether Judge Agee is blameless or responsible. Well, if you think that it still bears a close relationship, even though you're eliminating an element essentially here, which is publication or disclosure, then you'd still have to find that that harm is highly offensive, Your Honor. And here, driver's license numbers have been found multiple times not to meet that standard. So if the court allows, I'd like to address some of the standards that are in play here. Can you start by addressing TransUnion's reference to the Supreme Court's decision in Davis, right? So when it talks about the disclosure of private information, the example TransUnion gives us is Davis, which is a candidate's total expenditures, which frankly doesn't seem very private to me. I mean, to be totally fair, that wouldn't have been what I thought was private. And yet that's the example that the Supreme Court gives us. What do I do with Davis? Well, I think Davis is more of an example of that things could be intangible harms so long as they're recognized as creating standing. In that situation, it was complicated, Your Honor. Someone could have been essentially first prosecuted by a regulator for not making past disclosures. But the disclosure that was allegedly private, right, was the total personal expenditure in a campaign. I mean, this isn't like where he was spending money at a massage parlor, right? This is what he's spending on the campaign. Nothing about it seems like this sort of sexually information that he was otherwise entitled to keep private, which might have subjected him to criminal liability had he disclosed it as the statute required. And in this case, in O'Leary v. Trusted ID, in which Judge Agee participated in, the court first noted that TransUnion mentioned disclosure of private information. They also noted that neither party argued that below and that the plaintiff bears the burden of establishing standing. So we've argued that the argument that this is akin to disclosure of private facts has been waived. But nevertheless, O'Leary distinguished that case as saying that it had to do with impinging on the plaintiff's privacy of association. So I don't think that Davis is a good fit, but there is good fits for, you know, what has occurred here. And, you know, we can go through what the different potential analogous harms are. Excuse me. There we go. I apologize, Your Honor. I have numbered papers here. So we were talking about public disclosure of private facts. Basel found that Basel, which is the Seventh Circuit, and it was, it was, I'm sorry, the judge's name is escaping me right now. Easterbrook. That's right. He found that because driver's licenses are given to hotels, medical establishment, rental car companies for security, for voting, and that they're not immutable, that the driver's license are neither embarrassing nor private. But can't they be used to file for unemployment benefits? The plaintiffs have given statements with various experts indicating that they can be used. Yes, they can be, but the problem here is that they weren't, Your Honor. There's no harm here, actually, you know, alleged. So there was a discussion earlier about whether or not the mere presence on the dark web of somebody's driver's license number constitutes an injury in fact. It does not, because that was foreclosed by TransUnion. TransUnion basically said that the risk of future harm without more, it cannot constitute an injury in fact. And so... Well, but it could be that the risk of future harm plus expenditure of funds to mitigate that harm could constitute injury in fact, and are you suggesting that unless and until an individual's driver's license number is actually used to apply for unemployment benefits, they would have no standing? I am suggesting that, Your Honor, because I believe that, you know, the district court found that as well, that there was no misuse. At paragraph 52 of a plaintiff's complaint, they list a bunch of things, like you mentioned, unemployment benefits fraud. Your position is that until the actual identity theft takes place, there can be no future risk? Oh, no, no. Isn't that, I mean, that just like, that's nonsensical. So let's say that again. That's not my position, Your Honor. Okay. It doesn't, the risk of harm, until some misuse takes place, you have nothing. Once you have some misuse, you have potentially a risk of harm. And you have to take misuse along with other things that might create the imminence of harm and decide whether harm is imminent or not. What do you think counts as misuse? So, for example, in the complaint... Putting it up for sale on the dark web, is that an example? Well, nothing's happened with that data yet, Your Honor. So, for example, the district court credited the fact that the plaintiff said that their driver's license numbers appeared on the dark web. But nevertheless, they said they have not alleged any misuse of that information. Factually, that's correct. But in effect, you could have two different actions here. One is the initial breach, somebody has your data, and then there's a manifestation of that because it appears on the web, which is a different setting. So why wouldn't that differentiation between the fact of breach and its publication, why isn't that sufficient to say there's at least a, or both, a present injury and a future threat? Well, there's not a present injury under TransUnion when there's just a risk of harm, without actual harm you can point to. No, what I'm asking is that there may not be a risk of harm when there's a hack, but why isn't it different when it's actually posted for sale? Why isn't that a risk of harm? Well, because the risk would still entail a series of events that would involve third parties and speculative activity, which makes it inherently not imminent. There's been a series of case law beginning with Clapper, which basically says plaintiffs can't rely on speculation about the unfettered choices made by independent actors, not before the court. In Beck, this found no standing because the plaintiffs, to suffer the harm that they fear, would be required to assume an attenuated chain of possibilities. In Riley v. Ridian, the third court found that... Do you take back, so the court says in Beck, I'm in a curious line to me, but the court seems to say in Beck that a 33% chance of a future harm is not a substantial risk of that harm occurring? I'm not sure that I understand that, but is that the premise of your argument, that if you can't prove that it's something more than 33% chance of the harm actually coming to fruition, that you can't show this substantial risk that Clapper and others require? Well, the substantial risk that Clapper and others require under TransUnion now is just a predicate for finding something more, and that something more has to be something like emotional distress that's not conclusory pled or expenditures made in mitigation. And we don't have that here. As a matter of fact, what you have here in terms of allegations of that something more is... So your view is, just so I understand that, your view is you cannot have a substantial risk of a future harm to support a claim even if the evidence showed that it was 99% likely to happen. Imagine there was extraordinarily persuasive evidence that is 99% chance that you're going to develop this complication from your medical procedure. And you would say in that scenario that that is not a substantial risk of a future harm? The court can conclude that, and I wouldn't... I'm asking what you think. I would not contest that at all, Your Honor. But what that substantial risk does is prompts the next question, which is what else can they show? Because that harm in itself, post-TransUnion, is not enough to confer standing. It can confer, potentially, if you can talk about another harm that's going to occur, an injunctive relief remedy, but it cannot provide injury... Damages... Damages remedy, that's right. Absent emotional distress or expenditures. Correct. And here you've got conclusively pled emotional distress, which has been rejected as set forth in our briefs, and you've got essentially an unprecedented type of what they say is mitigation here. It's mainly researching their options, but never acting upon them, apparently, and reviewing their financial documentation, which everyone is likely to do anyway. And especially when you talk about people like Plaintiff Cardenas, who was already breached in the Equifax breach, and presumably would already be checking his, you know, credit reports and things like that. That, untethered to any kind of expenditures, has never been found to be that something more that's required to show a present injuring fact, Your Honor. Before you sit down, could I ask whether your client has done anything to change the network security following this data breach? Well, Your Honor, yes, of course. Every breach presumably creates a reckoning for, you know, updating and trying to prevent that particular intrusion from happening. But we contest that it's plausibly pled that there was this auto quote tool in the first place, and it's not pled by the plaintiffs that they encountered it, much less that it was still present after the breach, or still present now, that would entitle them to injunctive relief. Then was the breach limited to driver's license numbers, or were there other data exposed? It was limited to driver's license numbers, names, and dates of birth. But importantly, the theory behind this is that a threat actor would have already had to possess some of that data and impersonate the plaintiff in order to perpetrate this fraud. So I would under that circumstance, this is truly a publication, if you're going to do an analogy, because what you have there is someone tricking you into saying, that's not publishing someone's information to the public at large, it's publishing it to the person that they believe it is. So I believe that's a bridge too far. And again, highly offensive is a requirement for this data. We've cited the case law that says that this is not highly offensive. So the question just becomes, how far do you stretch the standard of a close relationship to a traditionally recognized harm to get the proxy harm that has been found in other cases? And I believe I'm out of time, so I'm going to turn it over to Ms. Nessler. Thank you, Your Honors. I think that this court is exactly right, that the analogy in transunion is to the type of harm. And there are recent Fourth Circuit cases that confirm that understanding post-transunion, namely Krakauer, the TCPA case that says you don't need all of the elements to get the analogy that their relevant analogy is to the type of harm. And Nessler, which says that it doesn't have to be actionable. I think one of the discussion about the dark web illustrates that pretty clearly, which is that we argue that the presence of information for Mr. Cardenas and for Mr. Holmes on the dark web of their information does constitute both a present injury, because that information has been sold to a third party that is now making it available for sale in a way that is not simply the breach itself, it is a second... Well, it may not have been sold, I mean the hacker may put it up himself. Or may put it up, that's correct, yes. But has taken an additional action in that situation. So your possession is that it's not the breach in and of itself that creates the injury, it's this posting, this additional action of posting the information. So multiple courts of appeal have found that the availability of putting it on the dark web is sufficient, so the breach itself would be sufficient. Bonac, the second circuit case, does find that. So in that case, the plaintiff alleged that their name and their social security number and no additional information was breached. And that it could be put on the dark web, so that's sufficient. You don't have to go that far here, because it was placed on the dark web. And that's analogous to the 11th circuit Brinker case and also the third circuit Clemens v. Executive Farm case, which overturns in large part the Riley case that defense counsel was referencing. That that placement can constitute both a present injury, right, because it's placed on there and that's identity theft, and also an increased risk of harm. Can you talk for just a second about the sort of private information piece? Yes. Right, and whether this is maybe Easterbrook's opinion of the 7th, but just sort of more generally, like why do we think that a driver's license number is the type of private information that causes like the same type of harm that we think about? I mean, I show my driver's license to lots of people. I'm old now, so not as often as I used to when I went into bars, but like I still show it all the time. I put it on all kinds of forms, right? It doesn't seem like the type of sexually immoral conduct that, you know, used to be the core of this private information. Yes, and so I think there are two answers to that question. The first is that Congress has determined that it's private information under the Driver's Privacy Protection Act, and it did so because the use of that number was used for specific harm related to privacy of people, i.e. that it's the gateway to all the rest of your motor vehicle information, including your name, your address, the make of your vehicles, who lives in your house, all of that. And so when it's used, it is associated with specific crimes related to that. And then second is, I think, the reference to Davis in TransUnion, which is that when we talk about a traditional privacy harm and the disclosure of private information, the question isn't whether it isn't an objective standard of whether everyone would find that disclosure offensive, but rather that it is in the context and is information that we've determined should be private in that context. So the easy analog is at common law, if you disclose information about, so if you go into somebody's house or you look in their window and you see something and you disclose that, we actually don't ask the question of what the person was doing in the house. The question, what that person's conduct isn't relevant. The relevant part is that it was being misused by a third party, and that's the nature of the harm, is that it's private and it has been disclosed, right? And not whether some heightened standard for that information. We also obviously disagree with Judge Easterbrook in that description of driver's license numbers. So in your example, like if I looked in your window and I saw you eating dinner and then I took out a newspaper ad that says she ate dinner last night, you think that... I think that's actionable at British and if that's the analog, then that's sufficient to meet that analog. Whether it states a DPPA claim is a wholly separate question, but it's an injury in fact, yes. Thank you, your honors. All right, thank you all very much. We appreciate counsel's arguments today. We're going to come down and greet counsel, but first I'd ask the clerk to adjourn court for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: G. Steven Agee, Julius N. Richardson, Nicole G. Berner